# IN THE COURT OF APPEALS OF IOWA

No. 15-0843
Filed November 9, 2016

**NATIONSTAR MORTGAGE, L.L.C., d/b/a CHAMPION MORTGAGE CO.,**
    Plaintiff-Appellee,

**vs.**

**LAVERNE WILLIAM BOWMAN and CHERYL DIANE BOWMAN,**
    Defendant-Appellants.
_____

        Appeal from the Iowa District Court for Des Moines County, John M. Wright, Judge.

        Home buyers appeal from the district court's ruling granting a successor mortgage company a priority position over their real estate contract and ordering foreclosure. **REVERSED AND REMANDED.**

        Steven E. Ort of Bell, Ort & Liechty, New London, for appellants.

        Brian D. Nolan and Leslie S. Stryker of Nolan, Olson & Stryker, P.C., L.L.O., Omaha, Nebraska, and Mark D. Walz of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellee.

        Heard by Danilson, C.J., and Doyle and McDonald, JJ.

**DANILSON, Chief Judge.**

Laverne and Cheryl Bowman appeal from the district court's ruling ordering foreclosure of a mortgage and the sale of property the Bowmans were purchasing on contract.

We reverse because Nationstar Mortgage, L.L.C., doing business as Champion Mortgage Co., is not entitled to subrogation under these facts. Champion, as a subsequent mortgagee, had the burden to establish that the mortgage was made without actual or constructive notice of existing rights in the property. Champion failed to meet that burden or prove equity was in their favor and, therefore, it was not entitled to subrogation or to have the title quieted in its favor. We remand for the purpose of the district court entering an order for judgment of dismissal of the petition for foreclosure and quiet title and further proceedings relevant to the Bowmans' counterclaim.

**I. Background Facts and Proceedings.**

There is no real dispute as to the facts underlying this action, and the parties stipulated the following facts are true.

Norma Sink was the mother of Laverne Bowman. Sink purchased her home at 1721 Weimer Street, Burlington, on June 13, 2001. The property was subject to two mortgages with F&M Bank. In 2004, Sink could no longer take care of her home, and she sold it to Bowman. Bowman was to pay Sink on contract, and Sink would make the mortgage payments to F&M Bank.

On October 27, 2004, Sink and Bowman signed a real estate contract for the installment purchase of the property using Iowa State Bar Association Form No. 141. The standard contract recited the purchase price was $35,000.

Bowman paid $5000 as a down payment. The balance was to be paid in monthly installments of $254 beginning January 1, 2005, payments due on the first of each month. Interest accrued at the rate of 5.5% per annum from November 1, 2004. The parties further agreed that Sink would pay the 2004 real estate taxes pro-rated from July 1, 2004, to December 1, 2004. Bowman was to pay all subsequent taxes as they became due. Further, the parties agreed Sink would have the right to mortgage the property up to 100% of the then-unpaid balance of the purchase price. The installment contract language of paragraph 5 provides, "Buyers hereby expressly consent to such a mortgage and agree to execute and deliver all necessary papers to aid Sellers in securing such a mortgage which shall be prior and paramount to any of Buyers' then rights in said property."

On November 4, 2004, the installment contract between Sink and Bowman was recorded. Bowman lived in the home at 1721 Weimer Street beginning in 2004 and made his monthly payments until his mother's death in December 2009.

In April 2008, Sink executed documents with a predecessor of Champion for a reverse mortgage on the property at 1721 Weimer Street. In notarized documents used for the transaction, Sink stated it was her primary residence and she was the owner of the property. At the time the reverse mortgage was granted, the balance owed on the installment contract between Sink and Bowman was $24,500. Pursuant to the language of the installment contract, Sink was allowed to mortgage the property up to that amount. However, the terms of the reverse mortgage agreement allowed Sink the right to draw upon funds up to $78,000.

Champion's predecessor did not perform an abstract search or obtain a title opinion to determine whether any entity could make a claim against the property. Had the reverse mortgage company checked for liens, it would have known about the 2004 recorded installment contract between Sink and Bowman.

The F&M Bank mortgages were paid in full with funds from the reverse mortgage. At the time of Sink's death on December 10, 2009, the principal owed on the reverse mortgage was in excess of $35,000. By letter dated January 19, 2010, Champion's predecessor gave notice to the Estate of Norma Sink, in care of Norma Jean Wagner, "there was a reverse mortgage on the borrower's home" and "[t]he reverse mortgage in the amount of $39,196.55" was in default and then due. No estate was ever opened for Sink. Norma Jean Wagner was not appointed personal representative of Sink's estate.

Bowman learned of the reverse mortgage after Sink's death. He made attempts to negotiate with the reverse mortgage company but was unsuccessful.

Bowman made no further payments on the installment contract after his mother's death nor did he pay the property taxes, although he and his wife continued to live in the home.

On October 17, 2011, Champion's predecessor filed a petition for foreclosure in rem and quiet title to 1721 Weimer Street. The petition asserted Sink had executed a promissory note in the principal sum of $78,000 on April 14, 2008, and gave a reverse mortgage to secure the note. The foreclosure petition asserted defendants Laverne and Cheryl Bowman were joined in the action because they "may claim some right, title or interest in the property . . . by virtue of a real estate contract dated October 27, 2004 and recorded November 8, 2004

in Document No. 2004-07415." The petition alleged the installment contract was junior in priority to the reverse mortgage. Champion asked the court to enter an order of foreclosure and quiet title in it.

Bowman answered and counterclaimed, asserting a superior interest by virtue of the installment contract signed and recorded nearly four years before Sink received the reverse mortgage. Bowman contended Sink and Champion's predecessor fraudulently entered into the reverse mortgage agreement to the Bowmans' detriment and asked the court to enforce the installment contract.

At the time of the bench trial on May 30, 2014, the principal owed on Champion's predecessor's note was $35,052.87; and interest owed from December 20, 2010, to May 30, 2014, was $5039.01. Champion had paid mortgage insurance in the amount of $2355.66, property tax of $4813, property insurance of $1141, an appraisal fee of $325, and property inspection costs of $870. Champion had also incurred attorney fees in the amount of $4800.

The trial court entered a ruling on January 12, 2015, determining that "by paying off F&M Bank's 2001 mortgages, Champion was subrogated to the position of F&M Bank. F&M Bank's 2001 mortgages gave them priority in the property superior to Bowman."

The court decreed Champion was entitled to judgment in rem against the real estate in the amount of the unpaid balance on the note, interest, fees, and costs.

The Bowmans filed a motion to amend on January 29, 2015. On March 25, 2015, the district court observed that Iowa Rule of Civil Procedure 1.904 required a motion to amend or enlarge must be filed within fifteen days after the

ruling is filed and found the Bowmans' motion was untimely. Moreover, the court determined its ruling had sufficiently addressed all issues. The district court thereafter entered a final foreclosure decree.

The Bowmans appeal.[1]

## II. Scope and Standard of Review.

This case was tried in equity, and therefore, our review is de novo. Iowa R. App. P. 6.907. We give weight to the trial court's findings, particularly concerning witness credibility, but we are not bound by them. Iowa R. App. P. 6.904(3)(g)

## III. Discussion.

On appeal, the Bowmans contend Champion was not entitled to equitable subrogation because the reverse mortgage company failed to determine there was a recorded contract for sale of the property. They also maintain Sink had no interest in the property to which the reverse mortgage could attach. Finally, the Bowmans assert the district court erred in concluding they had no legal interest in the property that would prevent Champion's foreclosure petition.

*A. Subrogation.* "Subrogation is the substitution of one person in place of another"; the party "substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities." *Kent v. Bailey*, 164 N.W. 852, 853 (Iowa 1917) (citation omitted).

---

[1] On its own motion, the supreme court ordered the parties to address whether the appeal was timely filed because an untimely rule 1.904(2) motion does not extend the time for appeal. After responses from the parties, the supreme court determined the January 12, 2015 district court ruling was interlocutory in nature and the notice of appeal was timely filed after the final foreclosure decree was entered. The case was then transferred to this court.

It has been styled a legal fiction whereby an obligation which has been discharged by a third person is treated as still subsisting for his benefit, so that by means thereof one creditor is substituted to the rights, remedies, and securities of another. The law recognizes two kinds of subrogation, legal and conventional. By the former is meant the right of substitution which springs as a matter of course from the mere fact of the payment of a debt without an agreement so to do between the parties. Conventional subrogation arises by virtue of an agreement express or implied, that a third person or one having no previous interest in the matter involved shall, upon discharging an obligation or paying a debt, be substituted in the place of the creditor in respect to such rights, remedies, or securities as he may have against the debtor.

. . . [S]ubrogation is not founded on contract or privity or strict suretyship, but is born of equity, and results from the natural justice of placing the burden where it ought to rest. The remedy depends upon the principles of justice, equity, and benevolence to be applied to the facts of the particular case. It is of equitable origin, adopted to compel the ultimate discharge of a debt or obligation by him who in good conscience ought to pay it. . . . The remedy is to be administered according to the established rules of equity jurisprudence.

*Id.* (citations omitted). In *Kent,* a second mortgagee paid off a first mortgagee who held a purchase money lien on real estate, which had priority over a previous judgment lien. *Id.* The court held that the second mortgage took the place of the first in regards to priority of liens. *Id.* The court noted there were no intervening equities, "the result being merely to establish a lien prior to defendant's judgment in the precise amount of [the first purchase money] mortgage." *Id.* at 855.

*B. Equities.* Here, the Bowmans contend, in effect, there are intervening equities that should preclude Champion from being subrogated to F&M Bank's priority position. They note that the reverse mortgage company did not perform a

record search and discover the installment contract[2] and did not ensure Sink was using the property as her residence before entering into the transaction with Sink (as required by the reverse mortgage agreement).[3]

Pursuant to the doctrine of equitable subrogation, one class of parties entitled to subrogation consists of subsequent encumbrancers paying off a prior encumbrance. *Miller & Chaney Bank v. Collis*, 234 N.W. 550, 552-53 (Iowa 1931). Our supreme court has held: "This doctrine permits a person who is satisfying an obligation owed by another to a third person to be placed in the obligee's position against the primary obligor." *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 156 (Iowa 2001) (citations omitted). And in *Klotz v. Klotz*, 440 N.W.2d 406, 409 (Iowa Ct. App. 1989), this court stated that "one who loans money to another to pay off a realty encumbrance with the understanding the loan is for that purpose is entitled to be subrogated to the rights of any previous encumbrances." We found the entity that had paid off a contract

---

[2] In Iowa, "[a]n instrument affecting real estate is of no validity against subsequent purchasers for a valuable consideration, without notice, . . . unless the instrument is filed and recorded in the county in which the real estate is located, as provided in this chapter." Iowa Code § 558.41(1) (2009). Thus, only a recorded instrument is valid against subsequent purchasers for value without notice.

"[T]he county recorder's record regarding the property constitutes constructive notice of instruments affecting title to real estate." *In re Vantiger-Witte*, 354 B.R. 862, 865 (Bankr. N.D. Iowa 2006) (citing *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 637 (Iowa 1996)). There is a presumption that the first recorded instrument has priority. *Miller v. Miller*, 232 N.W. 498, 499 (Iowa 1930).

In addition we note, "[a] bona fide purchaser is one who takes a conveyance of real estate in good faith from the holder of legal title, paying a valuable consideration for it without notice of outstanding equities." *Raub v. Gen. Income Sponsors of Iowa, Inc.*, 176 N.W.2d 216, 219 (Iowa 1970). A mortgagee is regarded the same as a purchaser for this purpose. *Id.*

[3] The reverse mortgage stated in paragraph 4: "Borrower [Sink] shall occupy, establish, and use the property as borrower's principal residence after the execution of this security agreement."

vendor's lien, which allowed the vendor to avoid forfeiture, was subrogated to the vendor's priority over a subsequent judgment lien. *Klotz*, 440 N.W.2d at 410.

Here, Champion's successor paid off the F & M mortgages, and if that was our only consideration our analysis would end as Champion would be entitled to subrogation. But our supreme court has also stated,

> The doctrine of equitable subrogation, however, is subject to the limitation that it will not apply where the equities are not in favor of the surety, because the doctrine is always used for the promotion of justice and the prevention of inequitable results. It will never be enforced, when doing so would be inequitable, or where it would work injustice to others having equal equities. [citation omitted] It necessarily follows that the equities of one seeking subrogation must be greater than those of him against whom subrogation is sought. *Ft. Dodge Bldg. & Loan Ass'n v. Scott*, 53 N.W. 283[, 284 (Iowa 1892)]. The doctrine of subrogation never interferes with equal or superior rights of others.

*Am. Sur. Co. of New York v. State Tr. & Sav. Bank of Mt. Pleasant*, 254 N.W. 338, 340 (Iowa 1934).

To evaluate the equities between the parties, we begin with the thorough analysis of the equitable subrogation doctrine and the various approaches states apply as discussed in *Bank of America, N.A. v. Prestance Corp.*, 160 P.3d 17 (Wash. 2007). In *Prestance*, the court stated "equitable subrogation simply seeks to maintain the proper order of priorities," but it appears to "conflict[] with the recording act because it is an exception to the general rule, 'first in time, first in right.'" 160 P.3d at 20. Yet, in essence, the doctrine serves the proper priorities by giving due consideration to equity and justice so no one is enriched by another's loss. *Id.*

The three approaches that states apply all relate to whether knowledge of the intervening interest is a factor to consider. *See id.* at 21. The first approach

is that actual or constructive knowledge of the intervening interest is irrelevant; the second approach provides a plaintiff with actual or constructive knowledge of the intervening interest cannot seek equitable subrogation; and a third approach "says a plaintiff with actual knowledge cannot seek equitable subrogation." *Id.* (emphasis omitted). The court in *Prestance* adopted the first approach, an approach supported by the Restatement (Third) of Property: *Mortgages*, section 7.6 (1997). *Id.* at 29. But, in *Prestance*, the court stated, "Equitable subrogation should never be allowed if a junior interest is materially prejudiced, but if the junior interests are unaffected, then there is no reason to deny it." *Id.* at 23-24.

Our supreme court has taken the second approach and denies equitable subrogation if the subsequent purchaser has either direct or constructive knowledge of the junior interest. *See Ft. Dodge*, 53 N.W. at 284. A subsequent purchaser or mortgagee, with actual notice of existing rights *or knowledge of sufficient facts to be charged with a duty to make inquiry*, could change that order of priority. *Sun Valley Iowa Lake Ass'n*, 551 N.W.2d at 637. The subsequent mortgagee has the burden to establish that the mortgage was made without either actual or constructive notice of existing rights in the property. *See id.* at 638.

Furthermore, in *Kent*, the court stated, "[E]quity will not rectify a mistake due to inexcusable negligence." 164 N.W. at 855. In *Ft. Dodge*, 53 N.W. at 284, the court refused to grant equitable subrogation where the plaintiff failed to exercise diligence in examining the records. *See also Webber v. Frye*, 202 N.W. 1, 2 (Iowa 1925) (stating "the right of subrogation is lost by inexcusable negligence on the part of the person asserting it"). "Without making this

examination, which the most ordinary care required, plaintiff made the loan, and accepted its mortgage. Surely equity will not reward such negligence by applying the doctrine of subrogation in favor of the negligent party. To do so would encourage carelessness in taking such securities." *Ft. Dodge*, 53 N.W. at 284.

Here, Champion argues that equity is nonetheless on its side because, even if the recorded installment contract had been discovered by examination of the title, the contract expressly allowed Sink to mortgage the property and the mortgage would have priority to Bowman's interest. We acknowledge this authorization, but Champion's characterization of the installment contract language omits a key provision:

> [Sink], [her] successors in interest or assigns may, and hereby reserve their right to at any time mortgage their property, title, or interest in such premises or to renew or extend any existing mortgage *for any amount not exceeding 100 percent of the then unpaid balance of the purchase price herein provided.*

(Emphasis added.)

Because the reverse mortgage company did not discover the contract, it did not know of the "then unpaid balance of the purchase price"[4] and did not limit its loan and mortgage to comply with the limitation. Although Champion's

---

[4] In Ohio, there is a statutory limitation: "No vendor shall place a mortgage on the property in an amount greater than the balance due on the contract without the consent of the vendee." Ohio Revised Code § 5313.02(B); *see Toledo Tr. Co. v. Cole*, 500 N.E.2d 920, 923 (Ohio Ct. App. 1986) (holding "when the land contract vendor has executed to the mortgagee a mortgage in excess of the balance of the purchase price remaining due from the land contract vendee, it is obvious that such a mortgagee, with actual or constructive notice of the land contract, cannot, as to the vendee, acquire any right in the premises subject of the mortgage, inconsistent with the rights of the vendee therein, other than remained in the mortgagor-vendor as to such vendee").

successor was not bound by the contract's terms, it has the burden to show equity favors equitable subrogation under these facts.[5]

Champion also argues failing to subrogate it to F&M Bank's priority position would not be equitable because Bowman "could not pay what he owed" and "did not fulfill his requirements under the land contract." It appears the trial court was convinced by this reasoning. The court wrote:

> The court does not overlook the fact that Bowman paid his monthly obligation under the contract until his mother died. He stands to lose that equity through this foreclosure. But, it is not against Champion that he has a claim for this money. It is against his mother's estate, an estate never opened.
> The contract required Bowman to pay a sum certain in order to obtain legal ownership of the property. He stopped paying this obligation upon Sink's death. He did not pay the monthly amount to F&M Bank or to the reverse mortgage company. He did not open an estate for his mother and continue to pay the estate what he owed. Instead, he attempted negotiations with the reverse mortgage company. No agreement was reached. In lieu of paying his monthly obligation, he simply quit paying altogether. In fact, he failed to pay the property taxes. Champion has also paid the premiums for property insurance. Bowman does not have a legal interest in the property that prevents Champion's foreclosure petition.

But these breaches of the land contract do not inure any benefit to Champion as the contract has not been forfeited, and, if subrogation had been granted, any payments towards the property taxes would have only gratuitously benefited Champion.

---

[5] The note signed by Sink stated, in part:
> Borrower [Sink] shall have no personal liability for payment of the debt. *Lender shall enforce the debt only through sale of the property covered by the security instrument.* If this note is assigned to the secretary, the borrower shall not be liable for any difference between the mortgage insurance benefits paid to lender and the outstanding indebtedness, including accrued interest, or by borrower at the time of the assignment.

(Emphasis added.)

More significantly, we find the trial court placed the burden on the wrong party in this action. Here, the concern is whether Champion should be subrogated to the rights F&M Bank had in 2001, and it is Champion's burden to prove equity requires the result, not Bowman's.[6] Champion cannot meet its burden because it had constructive notice of Bowman's existing rights by virtue of the recorded installment contract. *See Sun Valley Iowa Lake Ass'n*, 551 N.W.2d at 637. And Champion's predecessor had constructive notice of existing rights in the property. Moreover, the failure to examine the records is a failure to exercise due diligence and the equities favor Bowman. Champion should not be granted a superior interest, which would allow foreclosure on its mortgage and a forced sale of the property.

As further support, we note even though the court in *Prestance* adopted the first approach where knowledge is irrelevant, it nonetheless concluded, "[e]quitable subrogation should never be allowed if a junior interest is materially prejudiced." 160 P.3d at 23. This position is consistent with the Restatement (Third) of Property: *Mortgages*, section 7.3(a)(1), "If a senior mortgage is released of record and, as a part of the same transaction, is replaced with a new mortgage, the latter mortgage retains the same priority as its predecessor," except the retention of priority does not apply "to the extent that any change in

---

[6] We have no information in this record on whether Bowman—at the time Sink entered into the reverse mortgage—could have paid off his installment contract or made alternative financing arrangements. In equity, what occurred after the reverse mortgage company's negligence in failing to discover the installment contract should not be our focus.

The trial court stated Bowman did not "pay the monthly amount to F&M Bank" but there was no money due F&M Bank because its mortgages had been released. The court also faults Bowman for failing to pay the reverse mortgage company. However, according to Bowman's trial testimony, the reverse mortgage company would not work with anyone other than the administrator of the estate.

the terms of the mortgage or the obligation it secures is materially prejudicial to the holder of a junior interest in the real estate." Although the term "materially prejudicial" is not defined, a comment in the Restatement states, "[o]bviously an increase in the principal amount will prejudice the holders of junior interests." Restatement (Third) of Property: *Mortgages*, § 7.3 cmt. b. Our facts fit squarely within this principle. Because the contract language prohibited any new mortgage in excess of the unpaid balance, and the reverse mortgage resulted in a significant increase in the principal amount, Bowman's junior interest was materially prejudiced. This principle is also akin to a principle cited in *Klotz*, 440 N.W.2d at 409-10, where we explained that subrogation should be liberally granted so long as the transaction "does not place an innocent party in a position more unfavorable than where he or she originally stood."

We conclude the trial court erroneously subrogated Champion to F&M Bank's priority position and we therefore reverse and remand for further proceedings.

*C. Sink's interest in the real property.* The parties dispute whether Sink had an interest in the property allowing her to execute a mortgage secured by the property. We need not address this issue because we have determined, even if she had an interest, the equities do not support subrogation. We also note, because of her death, any interest in real property vested in Sink's estate upon her death, is subject to the possession of the personal representative and sale by

the court.[7]   *See* Iowa Code § 633.350, .351; *In re Estate of Ferris*, 14 N.W.2d 889, 899 (Iowa 1944).

   *D. Quiet-title cause of action.*   Because of our disposition of the subrogation issue, the district court's order quieting title in Champion is also reversed as Champion is not entitled to the relief sought.

## IV. Conclusion.

   We reverse because Champion is not entitled to subrogation under these facts.  Because Champion was not entitled to subrogation, it is also not entitled to have the title quieted in its favor.  We remand for the purpose of the district court entering an order for judgment of dismissal of the petition for foreclosure and quiet title, and further proceedings relevant to the Bowmans' counterclaim.

   **REVERSED AND REMANDED.**

---

[7] The Iowa Probate Code authorizes the appointment of an administrator in both intestate and testate administrations.  *See* Iowa Code §§ 633.229, .294; *see also Ryan Cos. US, Inc. v. Mahoney*, No 05-0496, 2006 WL 228969, at *3 (Iowa Ct. App. Feb. 1, 2006) ("Parties who should be joined as defendants in a quiet title action 'include all those who appear of record to have a possible claim or interest in the property.'  65 Am. Jur. 2d *Quieting Title* § 65, at 48 (2001).  Thus, '*all owners of an interest in the property are presumably indispensable parties to such an action,* and no decree affecting title to real estate may be entered unless all of the parties who will be directly affected by any judgment that may be rendered are before the court.'  *Id.* § 68, at 50-51.").  We recognize the foreclosure action was in rem, however, the same is not true in respect to the quiet-title action.